UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/20/18

7 WEST 57TH STREET REALTY COMPANY,
LLC,

               Plaintiff,

      - against -

CITIGROUP, INC.; CITIBANK, N.A.; BANK OF
AMERICA CORP.; BANK OF AMERICA N.A.;
BARCLAYS BANK PLC; UBS AG; JPMORGAN
CHASE & CO.; JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION; CREDIT SUISSE
GROUP AG; BANK OF TOKYO-MITSUBISHI
UFJ LTD.; COOPERATIEVE CENTRALE
RAIFFEISEN-BOERENLEENBANK B.A.; HSBC
HOLDINGS PLC; HSBC BANK PLC; HBOS
PLC; LLOYDS BANKING GROUP PLC; ROYAL
BANK OF CANADA; THE NORINCHUKIN
BANK; ROYAL BANK OF SCOTLAND GROUP,
PLC; WESTLB AG; WESTDEUTSCHE
IMMOBILIENBANK AG; DEUTSCHE BANK
AG,

            Defendants.

**MEMORANDUM
OPINION & ORDER**

13 Civ. 981 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        On February 13, 2013, Plaintiff 7 West 57th Street Realty Company, LLC – the

assignee of Sheldon H. Solow – filed this action against Defendants Citigroup, Inc.; Citibank,

N.A.; Bank of America Corp.; Bank of America N.A.; Barclays Bank Plc; UBS AG; JPMorgan

Chase & Co.; JPMorgan Chase Bank, National Association; Credit Suisse Group AG; Bank of

Tokyo-Mitsubishi UFJ Ltd.; Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.; HSBC

Holdings Plc; HSBC Bank Plc; HBOS Plc; Lloyds Banking Group Plc; Royal Bank of Canada;

The Norinchukin Bank; Royal Bank of Scotland Group, Plc; WestLB AG; Westdeutsche

Immobilienbank AG; and Deutsche Bank AG, alleging that Defendants colluded to manipulate

the London InterBank Offered Rate for the U.S. dollar ("USD-LIBOR") in 2008. (Am. Cmplt. (Dkt. No. 95)) Plaintiff claims that Defendants – who are members of the British Bankers Association, and who were responsible for submitting interest rates that the BBA used to calculate USD-LIBOR in 2008 – violated Section 1 of the Sherman Act, 15 U.S.C. § 1; the Clayton Act, 15 U.S.C. § 12 et seq.; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; and New York's Donnelly Act, N.Y. Gen. Bus. Law § 340. (SAC (Dkt. No. 174-1) ¶ 1)

On March 31, 2015, this Court granted Defendants' Rule 12(b)(2) and Rule 12(b)(6) motions to dismiss the Amended Complaint. (See Order (Dkt. No. 172))[1] This Court's dismissal order granted Plaintiff leave to move to amend (see id. at 54), and on June 1, 2015, Plaintiff filed a motion for leave to file a Second Amended Complaint ("SAC"). (Mot. (Dkt. No. 174))

Defendants contend that Plaintiff's motion to amend should be denied on grounds of futility. Defendants contend that the proposed SAC does not (1) demonstrate that this Court has personal jurisdiction over the Foreign Bank Defendants; (2) cure the deficiencies in Plaintiff's antitrust claims; and (3) cure the flaws in Plaintiff's RICO claim. (See Defs. Br. (Dkt. No. 181))

For the reasons stated below, Plaintiff's motion for leave to file a Second Amended Complaint will be denied.

---

[1] Familiarity with the March 31, 2015 order is presumed.

## I.   FACTUAL BACKGROUND

### A.   THE ALLEGED LIBOR-FIXING SCHEME

The London InterBank Offered Rate ("LIBOR") is set daily by the British Bankers' Association ("BBA"), a non-regulatory body governed by a board composed of members of various banks. (SAC (Dkt. No. 174-1) ¶¶ 6, 43, 45) LIBOR functions as a pricing mechanism and benchmark for determining, inter alia, interest rates for trillions of dollars in financial instruments worldwide. (Id. ¶¶ 5, 55-60)

---

[2] The following facts are drawn from the proposed SAC and are presumed true for purposes of resolving whether Plaintiff's motion to amend would be futile. See Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc., No. 08 Civ. 1533 (BSJ) (JCF), 2011 WL 1142916, at *4 (S.D.N.Y. Mar. 22, 2011); see also Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). "Because determinations of futility on a motion for leave to amend are subject to the same standards as motions under Rule 12(b)(6), '[f]utility is generally adjudicated without resort to any . . . evidence [outside the face of the complaint].'" Gary Friedrich Enterprises, LLC, 2011 WL 1142916, at *4 (quoting Wingate v. Gives, No. 05 Civ. 1872 (LAK) (DF), 2009 WL 424359, at *5 (S.D.N.Y. Feb. 13, 2009)). The Court may properly consider documents attached to the complaint as exhibits, incorporated by reference, or integral to the Complaint, however. See, e.g., Max Impact, LLC v. Sherwood Grp., Inc., No. 09 CIV. 902 (LMM) (HBP), 2012 WL 3831535, at *4 (S.D.N.Y. Aug. 16, 2012) ("[I]n making futility determinations, the court must limit itself to the allegations in the complaint, as well as to any documents attached to the complaint as exhibits or incorporated by reference." (citations omitted)); see also Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y., 678 F.3d 184, 187 (2d Cir. 2012). Accordingly, in resolving Plaintiff's motion, the Court has also considered documents that are incorporated into the proposed SAC by reference, including non-prosecution and deferred prosecution agreements that certain Defendants entered into with the United States Department of Justice, as well as certain press releases and news articles concerning the manipulation of LIBOR. (See SAC (Dkt. No. 174-1)). The Court has also taken judicial notice of public filings in New York state court proceedings brought by Defendant Citibank, N.A. against Solow. See Global Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 157 (2d Cir. 2006) ("'[In deciding a motion to dismiss,] [a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" (quoting Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)); Jermaine Dunham v. City of New York, et al., No. 11 Civ. 1223 (ALC) (HBP), 2018 WL 1305460, at *5 (S.D.N.Y. Mar. 13, 2018) (noting that, as with a motion to dismiss, a court can "consider matters of which judicial notice may be taken" in ruling on whether a proposed amendment would be futile).

The BBA calculates and publishes LIBOR for ten currencies, including the U.S. dollar. (Id. ¶ 46) Each of these currencies is overseen by a separate BBA "Contributor Panel." (Id.) A Contributor Panel consists of various banks that – as described below – provide submissions to the BBA that are used to calculate the daily LIBOR for that panel's particular currency. (See id. ¶¶ 46, 49-50)

Defendants are, or were, members of the Contributor Panel for the U.S. dollar. (Id. ¶ 43) Defendants are also horizontal competitors across a range of financing activities, including transactions that expressly incorporate LIBOR as a benchmark. (Id. ¶¶ 36, 43)

USD-LIBOR is set daily through a process orchestrated by the BBA. (See id. ¶ 48) Each day, the BBA asks the sixteen banks on the Contributor Panel for USD-LIBOR (the "contributing banks") "[a]t what rate [of interest] [they] could . . . borrow funds, were [they] to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m." (Id.) Under BBA rules, each bank's submission is meant to reflect the interest rate at which members of the bank's staff – who are primarily responsible for management of the bank's cash – believe that the bank could borrow unsecured interbank funds in the London market. (Id. ¶ 49) Under BBA rules, each contributing bank's submission must be based on its own independent good faith judgment, taking into account market conditions and the bank's posture as a borrower in the market for interbank loan funds. (Id. ¶ 50) The contributing banks' daily submissions to the BBA reflect their costs of borrowing funds at three maturity dates – one-month, three-months, and six-months. (Id. ¶ 48)

Thomson Reuters – an independent entity – collects the contributing banks' submissions on the BBA's behalf. (Id. ¶¶ 52, 54) Using the contributing banks' submissions, Thomson Reuters calculates USD-LIBOR through an "inter-quartile" methodology, in which it

4

discards the four highest and the four lowest submissions, and then averages the remaining eight submissions to arrive at the USD-LIBOR for a given day. (Id. ¶¶ 48, 54)

The BBA requires each contributing bank to arrive at its own daily submission without referring to the submissions of other banks on the Contributor Panel. (Id. ¶¶ 49, 51) In order to prevent collusion and ensure that each submission is independent, each bank is further required to keep its submission confidential until after Thomson Reuters publishes the daily LIBOR rates. (Id. ¶¶ 51, 54) When LIBOR is published, the rates submitted by each individual contributor bank are published as well, so that it is clear how the LIBOR rates were calculated. (Id. ¶ 52)

The BBA also prohibits banks from submitting contributions that are based on the pricing of any derivative financial instruments tied to LIBOR. (Id. ¶ 49) This prohibition is intended to prevent contributing banks from making submissions based on a motive to maximize profits or minimize losses in connection with such derivative transactions. (Id.)

According to the proposed SAC, however, by 2008 Defendants were not complying with the BBA's rules governing their submissions. (See id. ¶¶ 5-6) Instead, "Defendants conspired to . . . manipulate USD-LIBOR by falsely reporting to the BBA the . . . interest rates at which the Defendant banks expected they could borrow funds . . . on a daily basis." (Id. ¶¶ 6, 73, 80)

Traders at the contributing banks asked colleagues who were responsible for submitting rates to the BBA (the "LIBOR submitters") to submit rates that would benefit the bank's own trading positions, as opposed to rates that reflected the bank's good faith judgment of its true cost of borrowing that day. (See id.) Traders also requested that their counterparts at other contributing banks do the same. (See id.) The traders made these requests through

5

electronic messages, telephone calls, and in-person conversations. (See id. ¶ 61). The LIBOR submitters frequently agreed to accommodate these requests. (Id.)

Through their traders' requests – and the LIBOR submitters' acquiescence – Defendants caused rates to be submitted to the BBA that served Defendants' own financial interests, rather than complying with BBA standards. (See id. ¶¶ 5, 6, 61) As a result, USD-LIBOR calculated on the basis of these rates was "artificial" and did not reflect the contributing banks' true costs of borrowing under actual market conditions. (See id. ¶¶ 5-6) Because LIBOR is used as the "pricing mechanism and the primary benchmark for interest rates," Defendants' collusion and manipulation of LIBOR "affected the pricing of trillions of dollars' worth of financial transactions in the United States, including bank loans and municipal bonds." (Id. ¶¶ 6-7, 56)

## B.    SOLOW'S LOANS AND 2008 DEFAULT

Solow – who assigned his claims related to this action to Plaintiff – pledged a portfolio of more than $450 million in high-grade municipal bonds as collateral for LIBOR-denominated loans in or about 2003. (See id. ¶¶ 1, 9-10) Several of these loans were issued by Defendant Citibank, N.A. (Id. ¶ 9) The interest rate for these loans was determined by reference to USD-LIBOR. (See id.) Between 2003 and 2008, the interest rate on Solow's loans was LIBOR + 0.75%. (See id. ¶ 166) In March 2008, however, Citibank increased the interest rate on Solow's loans to LIBOR + 1.25%. (Id.)

According to the proposed SAC, statistical analysis indicates that – at certain times between August 31, 2007 and October 22, 2008 – there was a negative correlation coefficient relationship between one-month USD-LIBOR rates and Standard & Poor's ("S&P") New York AMT-Free Municipal Bond Index (the "S&P bond index"), which is an index that

6

measures the performance of bonds similar to those in Solow's portfolio. (Id. ¶ 176) This analysis suggests that an increase in one-month USD-LIBOR during those periods was, on average, associated with a decline in the value of the bonds listed in the S&P bond index. (Id.) In other words, a manipulation of LIBOR that caused interest rates to increase would cause the value of the bonds in the Solow portfolio to decline. (Id. ¶ 168)

Although Defendants' alleged manipulation of LIBOR "tended toward overall suppression of LIBOR for much of the conspiracy period," Defendants "increased, decreased, or maintained the submitted LIBOR rates in order to support their trading positions or other needs of the moment." (Id. ¶¶ 9, 177) In the months leading up to the liquidation of Solow's bond portfolio in November 2008, LIBOR was "artificially inflated as a result of Defendants' conduct." (Id. ¶¶ 176-180) For example, between September 12, 2008 and October 10, 2008, Defendants' submissions to the BBA for the calculation of USD-LIBOR were higher than their true costs of borrowing, which resulted in the artificial inflation of USD-LIBOR during that period. (Id. ¶¶ 169, 171-72, 177-78)

On September 24, 2008, Citibank notified Solow that on five consecutive days between September 17 and September 23, 2008, the value of his bond portfolio had dropped below the value required as collateral for his loans. (Id. ¶¶ 167, 170) Solow was then current on his loans, but Citibank nonetheless declared a technical default and seized Solow's bond portfolio. (Id. ¶¶ 9, 167, 178)

On November 3, 2008, Solow's portfolio – which had been worth $450 million when pledged as collateral – sold for approximately $415 million, net of commissions. (Id. ¶ 179) Defendants Citibank, JPMorgan, Bank of America, Barclays, and Deutsche Bank were "direct and indirect" participants in the liquidation of the portfolio, with Citibank purchasing a

7

substantial portion of the portfolio in the first instance. (Id. ¶ 178) Because the sale of Solow's bond portfolio did not fully satisfy his debt, Citibank seized the bond portfolio's earned interest of more than $15,000. (Id. ¶ 179)

Between October 6 and November 13, 2008, Citibank also seized more than $4.2 million in cash from Solow's accounts. (Id.) Citibank claimed that at least $2.1 million of the cash seized was for interest that Solow owed on the loans after default. (Id.) In calculating interest, Citibank applied a "default" interest rate, which was LIBOR-denominated and higher than the interest rate that had applied prior to Citibank's declaration of default. (See id.)

After these transactions, Citibank still claimed a $67 million deficiency, and demanded immediate payment of the deficiency and an additional $18.5 million in cash collateral. (Id. ¶¶ 179-80) On December 16, 2008, Citibank filed suit against Solow in New York Supreme Court seeking the $67 million deficiency, interest at the default interest rate, $18.5 million in cash collateral and fees, management fees, expenses, costs, and attorneys' fees. (Id. ¶ 181)

On March 24, 2011, Citibank obtained a judgment against Solow in New York Supreme Court for more than $100 million. (Id. ¶ 183; Ruffino Decl., Ex. G (May 24, 2011 Judgment) (Dkt. No. 118-4) at 11) On February 23, 2012, the lower court's judgment was affirmed by the First Department. See Citibank, N.A. v. Solow, 92 A.D.3d 569, 570 (1st Dept.), leave to appeal denied, 19 N.Y.3d 807 (2012). Solow paid the judgment in full on May 23, 2012. (SAC (Dkt. No. 174-1) ¶ 182)

## II.    PROCEDURAL HISTORY

After satisfying the state court judgment, Solow assigned his claims arising out of the events described above to Plaintiff 7 West 57th Street Realty Company. (See id. ¶¶ 1, 10)

8

Plaintiff commenced this action on February 13, 2013. (Cmplt. (Dkt. No. 1)) The Amended Complaint was filed on June 11, 2013. (Am. Cmplt. (Dkt. No. 95))

On December 13, 2013, all Defendants moved to dismiss the Amended Complaint, arguing that (1) Plaintiff's claims are barred by the applicable statutes of limitations; (2) Plaintiff failed to state an antitrust claim; (3) Plaintiff failed to state a RICO claim; (4) Plaintiff's claims are barred by res judicata in light of the state court proceedings; and (5) Plaintiff lacks standing to assert Solow's claims. (See Dkt. Nos. 114, 115, 117)

On December 10, 2014, the Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays Bank PLC, Credit Suisse Group AG, Deutsche Bank AG, HSBC Holdings plc, HSBC Bank plc, Lloyds Banking Group plc, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., HBOS plc, the Norinchukin Bank, the Royal Bank of Canada, the Royal Bank of Scotland plc, Portigon AG, and Westdeutsche ImmobilienBank AG (collectively, the "Foreign Bank Defendants") moved to dismiss for lack of personal jurisdiction. (Mot. (Dkt. No. 139))

## A. The March 31, 2015 Order Dismissing the Amended Complaint

On March 31, 2015, this Court granted Defendants' motion to dismiss the Amended Complaint, holding that (1) the Court lacked personal jurisdiction over the Foreign Bank Defendants; (2) Plaintiff had not plausibly alleged an antitrust injury, and, accordingly, was not entitled to bring suit under the Sherman Act; and (3) Plaintiff's RICO claims "are barred by the statute of limitations and by res judicata." (See Order (Dkt. No. 172) at 25-26, 36-37, 52) Having dismissed all of Plaintiff's federal claims, this Court declined to exercise supplemental jurisdiction over Plaintiff's remaining state law claim under N.Y. Gen. Bus. § 340. (See id. at 53)

9

## 1. Personal Jurisdiction Over the Foreign Bank Defendants

As to personal jurisdiction, this Court first noted that Plaintiff did "not contend that there is any basis for the exercise of general jurisdiction." (Id. at 14) This Court then addressed Plaintiff's arguments concerning specific jurisdiction, consent to personal jurisdiction, personal jurisdiction premised on co-conspirators' acts, and personal jurisdiction under Fed. R. Civ. P. 4(k)(2). (See id. at 14-25)

With respect to specific jurisdiction, this Court noted that in order "'to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum state.'" (Id. at 16-17 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775 (1984)). This Court found "precious little in the Amended Complaint demonstrating a connection between the Foreign Banks' alleged suit-related conduct and New York, and . . . no allegations demonstrating that any such relationship arose out of contacts that the Foreign Banks created with New York." (Id. at 19 (citing Walden v. Fiore, 134 S.Ct. 1115, 1122-23 (2014)).

While the Amended Complaint cited Barclays' discharge of two Barclays employees, "Plaintiff ha[d] not pled facts suggesting that the conduct of the two Barclays employees has any connection with the injury suffered by Solow, or that the misconduct alluded to . . . took place within the relevant time period – September 12, 2008 to October 10, 2008." (Id. at 19-20)

The Amended Complaint also did not satisfy the Calder "effects test." (Id. at 20-21) Assuming arguendo that Plaintiff's allegations regarding the effect of Defendants' manipulation of LIBOR rates on Solow's bond portfolio were sufficient to demonstrate an effect in New York, "Plaintiff ha[d] not alleged facts demonstrating that the Foreign Banks 'expressly

10

aimed' their conduct at New York or its municipal bond markets." (Id. at 21 (quoting Tarsavage v. Citic Trust Co., Ltd., 3 F. Supp. 3d 137, 145 (S.D.N.Y. 2014)) The Court concluded that it did not have specific personal jurisdiction over the Foreign Bank Defendants. (Id.)

As to consent, this Court rejected Plaintiff's argument that the Foreign Bank Defendants consented to general personal jurisdiction in New York by virtue of their registration with the New York Department of Financial Services. (Id. at 21) In reaching this conclusion, this Court noted that New York Banking Law § 200(3) limited "any consent to personal jurisdiction by registered banks to specific personal jurisdiction." (Id. at 22 (emphasis in original) (citations omitted)) Accordingly, registration under this provision did not constitute consent to personal jurisdiction. (Id.)

As to Plaintiff's claim that personal jurisdiction could be premised on co-conspirators' acts, this Court found that the Amended Complaint did not plead sufficient facts to plausibly allege a conspiracy. (Id. at 22-23) Plaintiff's "attempts to support its conclusory allegations by citing guilty pleas, settlements, and accompanying admissions, along with "econometric evidence" of Defendants' LIBOR manipulation," were insufficient because Plaintiff had not shown "how the banks' guilty pleas, settlements, or admissions demonstrate a conspiracy to cause injury to Solow." (Id. at 23) Moreover, Plaintiff's "econometric evidence" was insufficient because "[a]nalysis that 'flags the possibility' of a conspiracy is not sufficient to meet the plausibility test under Iqbal." (Id. at 23-24 (citations omitted)) This Court also noted that Plaintiff had not explained how its allegations were sufficient "to satisfy the necessary elements for co-conspirator personal jurisdiction." (Id. (citations omitted))

As to personal jurisdiction under Fed. R. Civ. P. 4(k)(2), this Court found that the second required element was not met, because "'Plaintiffs ha[d] not certified that Defendants are

11

not subject to jurisdiction in any other state.'" (Id. (quoting Tamam v. Fransabank Sal, 677 F. Supp. 2d 720, 731 (S.D.N.Y. 2010)) Accordingly, this Court declined to apply Fed. R. Civ. P. 4(k)(2). (See id. at 24-25)

Because this Court found that there was no basis to exercise personal jurisdiction over the Foreign Bank Defendants, this Court dismissed Plaintiff's claims against them. (Id. at 25)

## 2. **Antitrust Claim**

In dismissing Plaintiff's antitrust claim under the Sherman Act, this Court held that Plaintiff had "not plausibly alleged an antitrust injury," and therefore lacked standing. (Id. at 36) Relying on Judge Buchwald's analysis in In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR I"), 935 F. Supp. 2d 666, 686 (S.D.N.Y. 2013), this Court found that "Plaintiff's allegations that the LIBOR-setting process is 'competitive' are not plausible on their face," because the "LIBOR-setting process is a cooperative and not a competitive exercise." (See Order (Dkt. No. 172) at 28-31, 33-34)

In particular, this Court found that Plaintiff's allegations that "'a Contributor Panel bank's LIBOR submissions [were] not [to] be influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR'" supported the notion that, in setting LIBOR, the banks were not competing with one another, but instead were participating in a collective exercise aimed at generating an objective, "good faith" benchmark." (Id. at 34 (citing Am. Cmplt. (Dkt. No. 95) ¶ 44)). And "[t]he fact that the benchmark set as a result of the LIBOR-setting process would be a basis for competition does not mean that the cooperative process of collecting submissions used to set LIBOR was a competitive exercise." (Id.)

12

This Court also found that many of the Amended Complaint's allegations were inconsistent with the notion that the LIBOR-setting process is a competitive exercise. In this regard, this Court cited the following allegations:  that "(1) Thomson Reuters – an agency independent of the BBA – collects, calculates, and publishes the daily LIBOR; (2) any bank that trades in the London market can apply to be on a Contributor Panel; and (3) the interquartile averaging method prevents individual or small groups of banks from influencing LIBOR with false submissions." (Id.)  The Court emphasized that "[n]one of these allegations have anything to do with the issue of whether the submission process is competitive." (Id. at 34)

This Court likewise held that the Amended Complaint's allegations that (1) Defendants are "horizontal competitors across a wide range of financing activities" ([Am. Cmplt. (Dkt. No. 95)] ¶ 36); (2) "LIBOR-denominated interest rates [are used] as a threshold or beginning point for competition among [Defendants] in the market for loans to their customers and others" (id. ¶ 52); (3) "LIBOR is also instrumental in establishing market prices for many types of interest-bearing debt securities, including financial instruments that are not specifically LIBOR-denominated" (id. ¶ 53);" and (4) the LIBOR-setting process is competitive because it is "designed to ensure that LIBOR would be based on competition in the interbank funding markets" (id. ¶ 48), were insufficient to demonstrate that manipulation of LIBOR had any effect on competition. (Order (Dkt. No. 172) at 35-36)

Accordingly, this Court found that Plaintiff had not plausibly alleged antitrust injury, and granted Defendants' motion to dismiss Plaintiff's antitrust claim. (Id. at 36)

### 3.    RICO Claims

This Court dismissed Plaintiff's RICO claims on the grounds that they were (1) time-barred; and (2) barred by res judicata. (Id. at 53)

13

With respect to the statute of limitations issue, this Court noted that "a May 29, 2008 Wall Street Journal article 'detailed' the 'divergence between [credit-default spreads ('CDS')] and LIBOR.'" (Id. at 38) Accordingly, "Plaintiff was on inquiry notice of the fact that LIBOR rates may have been manipulated" by at least May 29, 2008. (Id. at 39) This Court rejected Plaintiff's argument that the statute of limitations should be tolled because "(1) the LIBOR manipulation scheme had been made public, and (2) Defendants' 'reassurances' that no manipulation had occurred would have been entirely self-serving[,]" such that Plaintiff could not have reasonably relied on them. (Id.)

Because Solow was on inquiry notice as of May 29, 2008, and no inquiry was pursued, Plaintiff's RICO claims became time-barred after May 29, 2012. (Id.) Plaintiff's RICO claims were not filed until February 13, 2013, however. (Id. (citing Cmplt. (Dkt. No. 1)) Accordingly, this Court concluded that Plaintiff's RICO claims are time-barred.

With respect to res judicata, this Court found that "[e]ven if Plaintiff's RICO claims were not barred by the statute of limitations, they would be barred by res judicata, given the judgment" obtained by Citibank against Solow in New York Supreme Court on March 24, 2011. (Id. at 41-43) This Court concluded that (1) "there has been a final judgment on the merits"; (2) that the "prior proceeding also arose out of the same transactions and occurrences alleged here"; (3) Defendant Citibank, N.A., was a party to the state court action, and the other Defendants not named in the prior state court action "may properly be considered in privity with Citibank for res judicata purposes"; and (4) Plaintiff's RICO claims could have been asserted in the prior action. (Id. at 41-46)

In concluding that Plaintiff's RICO claims could have been asserted in the prior state court action, this Court rejected Plaintiff's arguments that Solow could not have raised his

14

RICO claims because he had no knowledge of them. (Id. at 50) This Court explained that the May 29, 2008 Wall Street Journal article reported the fraud several years before the state trial court entered judgment against Solow. (Id. at 50) This Court also noted that the Amended Complaint alleges that a "'public revelation regarding government investigations into possible LIBOR manipulation occurred on March 15, 2011,'" and that on March 16, 2011, March 17, 2011 and March 23, 2011, The Financial Times and Bloomberg reported that U.S. authorities were investigating whether several banks had manipulated the setting of LIBOR. (Id. at 51 (citing Am. Cmplt (Dkt. No. 95-1) ¶¶ 81-84)) "Even accepting Plaintiff's allegation that Solow did not know that the media reports concerning Defendants' LIBOR manipulation were true," this Court found that "these [multiple] news reports put Solow on inquiry notice." (Id. at 52) "Because Solow 'had sufficient information to create a duty of further investigation,' Plaintiff may not avoid the effects of res judicata." (Id. (citations omitted))

### 4. Leave to Amend

In dismissing the Amended Complaint, this Court granted Plaintiff leave to amend its antitrust claim. (See id. at 54) Because Plaintiff's RICO claims are barred by the statute of limitations and res judicata, however, this Court found that any amendment would be futile, and ·denied leave to amend "as to those claims." (Id.)

## B. Plaintiff's Motion for Leave to File a Second Amended Complaint

Plaintiff argues that (1) the "newly-added allegations in the [proposed] SAC demonstrate that each [of the Foreign Bank Defendants] has sufficient contacts with the United States and this forum" to establish personal jurisdiction; (2) it has standing to assert its antitrust claim in light of the Second Circuit's decision in Gelboim v. Bank of Am. Corp., 823 F.3d 759, 772 (2d Cir. 2016) vacating Judge Buchwald's decision, upon which this Court relied in

15

dismissing Plaintiff's antitrust claim; and (3) it should be granted leave to "re-plead its RICO claim" in light of the Second Circuit's summary order in BPP Ill., LLC v. Royal Bank of Scotland Grp. PLC, 603 F. App'x 57 (2d Cir. 2015). (See Pltf. Br. (Dkt. No. 174-1) at 2, 7; Pltf. Ltr. (Dkt. No. 203) at 1-3)

Defendants oppose Plaintiff's motion on the grounds that the "proposed amendment would be futile." (Def. Br. (Dkt. No. 181) at 6)

## DISCUSSION

## I.    LEAVE TO AMEND

District courts "ha[ve] broad discretion in determining whether to grant leave to amend," Gurary v. Winehouse, 235 F.3d 793, 801 (2d Cir. 2000), and "leave to amend should be freely granted when 'justice so requires[.]'" Pangburn v. Culbertson, 200 F.3d 65, 70 (2d Cir. 1999) (quoting Fed. R. Civ. P. 15(a)); Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.'" (quoting Forman v. Davis, 371 U.S. 178, 182 (1962))).

A court may properly deny leave to amend, however, in cases of "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh v. City of New York, No. 10 Civ. 7218 (HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011) ("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints should be 'freely given,' leave to amend need not be granted where the

16

proposed amendment is futile."). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Allegations that "are no more than conclusions, are not entitled to the assumption of truth," however. Iqbal, 556 U.S. at 679. A pleading is conclusory "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" id. at 678, offers "'a formulaic recitation of the elements of a cause of action,'" id., or does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007). In considering a motion to dismiss under Rule 12(b)(6), a district court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco, 622 F.3d at 111 (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

"[Parties] opposing a motion to amend . . . bear[] the burden of establishing that an amendment would be futile." Bonsey v. Kates, No. 13 Civ. 2708 (RWS), 2013 WL 4494678,

at \*8 (S.D.N.Y. Aug. 21, 2013) (citing <u>Blaskiewicz v. Cty. of Suffolk</u>, 29 F. Supp. 2d 134, 137-38 (E.D.N.Y. 1998)).

## II.    ANTITRUST CLAIM

Plaintiff requests leave to amend its antitrust claim on the basis of the Second Circuit's decision in <u>Gelboim v. Bank of Am. Corp.</u>, 823 F.3d 759 (2d Cir. 2016). (<u>See</u> Pltf. Ltr. (Dkt. No. 203) at 1)  Plaintiff points out that – in dismissing Plaintiff's antitrust claim – this Court relied, in large part, on the district court's "reasoning that the LIBOR-setting process is cooperative rather than competitive and therefore cannot constitute antitrust injury." (<u>Id.</u>) Because <u>Gelboim</u> rejects that analysis, Plaintiff contends that leave to amend should be granted. (<u>Id.</u> at 1-3)

Defendants counter that even if Plaintiff's allegations now suffice to demonstrate antitrust injury, any amendment would still be futile because Plaintiff cannot demonstrate that it is an "efficient enforcer" of the antitrust laws. (<u>See</u> Def. Ltrs. (Dkt. Nos. 204, 220))

### A.    Antitrust Standing

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.  The private right of action to enforce this provision is set forth in Section 4 of the Clayton Act. <u>See</u> 15 U.S.C. § 15.

In order to bring a cause of action under the Sherman Act, a plaintiff must demonstrate antitrust standing, <u>i.e.</u>, that "'the plaintiff is a proper party to bring a private antitrust action.'" <u>Gelboim</u>, 823 F.3d at 770 (quoting <u>Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters</u>, 459 U.S. 519, 535 n. 31 (1983)).  "Like constitutional standing, antitrust standing is a threshold inquiry resolved at the pleading stage." <u>Id.</u> (citing <u>Gatt</u>

18

Commc'ns v. PMC Assocs., L.L.C., 711 F.3d 68, 75 (2d Cir. 2013)). To demonstrate antitrust standing, a plaintiff must demonstrate both (1) antitrust injury; and (2) that it is an efficient enforcer of the antitrust laws. Id. at 772.

### 1.   **Antitrust Injury**

In order for "[a] private plaintiff . . . [to] recover damages under § 4 of the Clayton Act, . . . [the] plaintiff must prove the existence of 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (emphasis in original) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). "An antitrust injury 'should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" Gelboim, 823 F.3d at 772 (quoting Brunswick, 429 U.S. at 489).

"When consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Id. (quoting Brunswick, 429 U.S. at 489). "Even though the members of [a] price-fixing group [a]re in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces." Id. at 773. The "anticompetitive effect of the . . . alleged conspiracy would be that consumers got less for their money." Id. at 774. Moreover, because "horizontal price-fixing conspiracies among competitors are unlawful per se," allegations "pleading harm to competition are not required to withstand a motion to dismiss." Id. at 771, 775-76 ("Appellants have alleged an anticompetitive tendency: the warping of market factors affecting the prices for LIBOR-based financial instruments. No

further showing of actual adverse effect in the marketplace is necessary.").

Here, Plaintiff alleges that the Defendants violated Section 1 of the Sherman Act by engaging in a horizontal price-fixing scheme to "fix[], maintain[] or ma[ke] artificial prices for LIBOR-based financial instruments, including [Solow's] loans and bond portfolio." Defendants' manipulation of USD-LIBOR allegedly contributed to the devaluation of Solow's bonds, resulting in Citibank's seizure and sale of Solow's bond portfolio at "artificially low prices." (SAC (Dkt. No. 174-1) ¶¶ 36, 163, 169, 199) Because Plaintiff has "identified an 'illegal anticompetitive practice' (horizontal price-fixing), ha[s] claimed an actual injury placing [Solow] in a ''worse position' as a consequence' of the Banks' conduct, and ha[s] demonstrated that [Solow's] injury is one the antitrust laws were designed to prevent," Plaintiff has plausibly alleged antitrust injury. See Gelboim, 823 F.3d at 775.

### 2. Efficient Enforcer

"The second question that bears on antitrust standing is whether plaintiff satisf[ies] the efficient enforcer factors." Id. at 777. The efficient enforcer inquiry turns on four factors: "(1) the 'directness or indirectness of the asserted injury,' which requires evaluation of the 'chain of causation' linking [plaintiff's] asserted injury and [defendants'] alleged price-fixing; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which appellants' damages claim is 'highly speculative'; and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" Id. at 778 (quoting Associated Gen. Contractors, 459 U.S. at 540-45). Given the unusual nature of the cases arising out of the alleged LIBOR price-fixing conspiracy, the Second Circuit has urged lower courts to pay "close attention" to the efficient enforcer

factors, and to carefully consider "whether the aims of the antitrust laws are most efficiently advanced by [plaintiffs] through these suits." See id.

As discussed below, Plaintiff's chain of causation is attenuated and its damages claim is likely to be "highly speculative." Accordingly, the Court concludes that Plaintiff lacks antitrust standing.

### a. **Causation**

Under the first efficient enforcer factor, courts evaluate the "chain of causation linking [plaintiff's] asserted injury and [defendants'] alleged price-fixing" by asking "whether the violation was a direct or remote cause of the injury." Id. at 772, 777. "The concern associated with remote causation – particularly in the present case – is that defendants will face 'damages disproportionate to [their] wrongdoing. . . .'" In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262 (NRB), 2016 WL 7378980, at *15 (S.D.N.Y. Dec. 20, 2016) (quoting Gelboim, 823 F.3d at 779). Accordingly, "[w]here the chain of causation between the asserted injury and the alleged restraint in the market 'contains several somewhat vaguely defined links,'" or "the causal relationship between the Defendants' actions and the Plaintiff's injury is too attenuated, the claim is too indirect" to support antitrust standing. Laydon v. Mizuho Bank, Ltd., No. 12 Civ. 3419 (GBD), 2014 WL 1280464, at *9 (S.D.N.Y. Mar. 28, 2014) (quoting Associated Gen. Contractors, 459 U.S. at 540).

In the context of cases alleging a LIBOR price-fixing conspiracy, the "antitrust standing of those plaintiffs who did not deal directly with the Banks" – commonly referred to as "umbrella purchasers" – presents a complex issue. See Gelboim, 823 F.3d at 778; In re LIBOR-Based Fin. Instruments Antitrust Litig., 2016 WL 7378980, at *15. "Umbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt

21

with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole." Gelboim, 823 F.3d at 778. "In such circumstances, 'the defendants secured no illegal benefit at [plaintiff's] expense,' and permitting recovery in such a transaction 'could subject antitrust violators to potentially ruinous liabilities, well in excess of their illegally-earned profits.'" In re LIBOR-Based Fin. Instruments Antitrust Litig., 2016 WL 7378980, at *15 (quoting Mid-West Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573, 583, 586 (3d Cir. 1979)). Indeed, "[r]equiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would . . . not only bankrupt . . . the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated." Gelboim, 823 F.3d at 779.

Ultimately, the standing inquiry in each antitrust case is a highly fact-specific determination. In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262 (NRB), 2016 WL 7378980, at *16 (S.D.N.Y. Dec. 20, 2016). After carefully considering the reasoning in Gelboim, this Court concludes that there is good reason "to draw a line between plaintiffs who transacted directly with defendants . . . and those who did not." See id. As Judge Buchwald explained,

[a] plaintiff and a third party could, and did, easily incorporate LIBOR into a financial transaction without any action by defendants whatsoever. . . . [P]laintiffs who did not purchase directly from defendants . . . made their own decisions to incorporate LIBOR into their transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit. To hold defendants trebly responsible for these decisions would result in "damages disproportionate to wrongdoing. . . ."

In re LIBOR-Based Fin. Instruments Antitrust Litig., 2016 WL 7378980, at *16 (quoting Gelboim, 823 F.3d at 779).

22

Here, Plaintiff's claim is even more attenuated than those of the bondholders in In re LIBOR-Based Fin. Instruments Antitrust Litig., 2016 WL 7378980, at *16. Plaintiff alleges that Solow pledged his bond portfolio as collateral for a loan, and that he suffered injury when Defendants' manipulation of LIBOR caused interest rates to increase, which in turn caused the value of Solow's bond portfolio to decline below the amount required as collateral for his loans. (SAC (Dkt. No. 174-1) ¶¶ 9, 167-68, 170) According to Plaintiff, Citibank then seized Solow's bond portfolio and sold it at a reduced value, resulting in a deficiency and further injury to Solow. (See id.)

Although Plaintiff contends that Solow transacted directly with Defendant Citibank – because Citibank issued him several loans – the root cause of Solow's injury is the devaluation and subsequent liquidation of his bond portfolio. (See id.; Pltf. Ltr. (Dkt. No. 221) at 2) Solow did not purchase his bonds directly from any Defendant, however. (See Am. Cmplt. (Dkt. No. 174-1) ¶ 9; Pltf. Ltr. (Dkt. No. 221) at 2) Moreover, Solow's municipal bonds were "not specifically LIBOR-indexed," and they "trade[d] in a decentralized dealer market that is illiquid and opaque and dominated by intermediaries that account for the majority of . . . customer transactions." (SAC (Dkt. No. 174-1) ¶ 8, 160-162)

Accordingly, the chain of causation between Plaintiff's alleged injury and Defendants' manipulation of LIBOR involves at least several "vaguely defined links," see Associated Gen. Contractors, 459 U.S. at 540, which require a complicated series of market interactions and assumptions, including that: (1) the Defendants conspired to inflate their USD-LIBOR submissions during the period leading up to the liquidation of Solow's bond portfolio – namely, September 12, 2008 to October 10, 2008; (2) Thompson Reuters compiled those submissions, and – after applying the interquartile averaging method – calculated LIBOR

23

benchmark rates that were artificial; (3) increased LIBOR rates caused interest rates to rise, notwithstanding the Second Circuit's point that "the worldwide market for financial instruments . . . is vast, and influenced by multiple benchmarks," see Gelboim, 823 F.3d at 782; (4) the general increase in interest rates caused Solow's municipal bonds to decline in value – even though they were not LIBOR-indexed and traded in a decentralized dealer market – because interest rates and bond prices generally move in opposite directions; and (5) the reduced valuation of Solow's collateral caused Citibank to declare a default and sell Solow's bond portfolio at a loss, causing injury to Solow. (See SAC (Dkt. No. 174-1) ¶¶ 48-54, 160, 167-71, 179) This attenuated chain of causation "between the alleged conspiracy and the asserted injury is too indirect to support antitrust standing." See Laydon, 2014 WL 1280464, at *9 (citations omitted); In re LIBOR, 2016 WL 7378980, at *16.

### b. Speculative Damages

Although "public policy require[s] that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created, . . . highly speculative damages [are] a sign that a given plaintiff is an inefficient engine of enforcement." Gelboim, 823 F.3d at 779.

Where, as here, "the 'theory of antitrust injury depends upon a complicated series of market interactions,' the damages are speculative . . . because 'countless other market variables' could affect pricing decisions." Laydon, 2014 WL 1280464, at *10 (quoting Reading Indus., Inc. v. Kennecott Copper Corp., et al., 631 F.2d 10, 12-13 (2d Cir. 1980)); In re LIBOR-Based Fin. Instruments Antitrust Litig., 2016 WL 7378980, at *17 (Damages may be unduly speculative where "the injury is so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions."). Indeed, the Second Circuit expressed skepticism that antitrust claims

24

premised on an alleged LIBOR-based price fixing conspiracy could satisfy this factor, noting that "[a]ny damages estimate would require evidence to 'support a just and reasonable estimate' of damages,' and it is difficult to see how [plaintiffs] would arrive at such an estimate, even with the aid of expert testimony." Gelboim, 823 F.3d at 779. In this context, "'the vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.'" Id. (quoting J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981)).

Here, the factors motivating the Second Circuit's concerns are particularly pronounced. Analysis of Plaintiff's injury would require a complex multi-step analysis to quantify the indirect effect of Defendants' alleged manipulation of USD-LIBOR on the value of Solow's bonds. First, Plaintiff would have to reconstruct the "hypothetical 'but-for' . . . [USD] LIBOR benchmark rates" during the period leading up to and following the liquidation of Solow's bond portfolio, and show how Defendants' manipulation of LIBOR rates affected the overall USD-LIBOR rate each day. See Laydon, 2014 WL 1280464, at *10. Then, Plaintiff would have to show how manipulation of USD-LIBOR rates affected general interest rates. Next, Plaintiff would have to demonstrate the extent to which general interest rates were inversely related to the value of his specific municipal bonds. Plaintiff would also have to quantify the extent to which the value of his bonds was affected by USD-LIBOR manipulation, as opposed to other market causes -- such as, most critically, the 2008 financial crisis.[3] Given

_____

[3] The period in which Plaintiff alleges that interest rates rapidly increased as a result of Defendants' LIBOR manipulation – September 12, 2008 to October 10, 2008 – coincides with the height of the 2008 financial crisis. Indeed, the period cited by Plaintiff ends less than a week before nine banks announced their decision to participate in the Troubled Asset Relief Program ("TARP"). See Mark Landler & Eric Dash, Drama Behind a $250 Billion Banking Deal, N.Y. Times (Oct. 14, 2008), http://www.nytimes.com/2008/10/15/business/economy/15bailout.html. This Court may take judicial "notice of the events constituting the financial crisis that occurred

25

Plaintiff's concession that Solow's municipal bonds were not LIBOR-indexed, and that they "trade[d] in a decentralized dealer market that is illiquid and opaque and dominated by intermediaries that account for the majority of . . . customer transactions," there are many independent market factors that could have affected the value of his bonds. (See SAC (Dkt. No. 174-1) ¶¶ 160-62) Accordingly, this Court concludes that Plaintiff's damages would be highly speculative.

Because Plaintiff has not satisfied at least two of the efficient enforcer factors, Plaintiff lacks antitrust standing. See Laydon, 2014 WL 1280464, at *10. Accordingly, any proposed amendment would be futile, and Plaintiff's request for leave to amend its antitrust claim will be denied.[4]

## III. RICO CLAIMS

In its March 31, 2015 order, this Court found that Plaintiff's RICO claims are time-barred and barred by res judicata. Accordingly, the Court denied Plaintiff leave to amend its RICO claims on the grounds that any amendment would be futile. (See Order (Dkt. No. 172) at 54) Plaintiff nonetheless contends that it should be allowed to re-plead its RICO claims in light of the Second Circuit's summary order in BPP Illinois, LLC v. Royal Bank of Scotland Grp. PLC, 603 F. App'x 57 (2d Cir. 2015). (Pltf. Br. (Dkt. No. 174-1) at 2, 10)

Defendants counter that BPP Illinois is not on point, because the Second Circuit's summary order addresses the Pennsylvania's statute of limitations, rather than the federal inquiry

---

in fall 2008, . . . because the Court 'may take judicial notice of indisputable historical events.'" See Starr Int'l Co. v. Fed. Reserve Bank of New York, 906 F. Supp. 2d 202, 205 (S.D.N.Y. 2012), aff'd, 742 F.3d 37 (2d Cir. 2014) (citations omitted).

[4] Having concluded that Plaintiff lacks antitrust standing because its chain of causation is attenuated and its damages claim is highly speculative, the Court does not reach the remaining efficient enforcer factors.

notice standard that applies to Plaintiff's RICO claims. (Def. Br. (Dkt. No. 181) at 20).

Defendants further argue that – even if Plaintiff's RICO claims were not time-barred –

amendment would still be futile, because Plaintiff's RICO claims are barred by res judicata. (Id.

at 21)

      As an initial matter, it must be acknowledged that Plaintiff's argument regarding

leave to amend its RICO claims is barred by the law of the case doctrine. In its March 31, 2015

decision, this Court held that granting leave to amend would be futile, because Plaintiff's RICO

claims are both time-barred and barred by res judicata. That decision is law of the case and bars

Plaintiff's present argument. See DiLaura v. Power Auth. of State of New York., 982 F.2d 73,

76 (2d Cir. 1992) ("The law of the case doctrine 'posits that when a court decides upon a rule of

law, that decision should continue to govern the same issues in subsequent stages in the same

case.'" (citations omitted)); Semple v. Eyeblaster, Inc., No. 08 Civ. 9004 (HB), 2009 WL

1748062, at *2 (S.D.N.Y. June 19, 2009) ("Plaintiff's motion appears to be, in substance, a

request to overturn the Court's order that her complaint could not be further amended, which is

the law of the case. . . . Under the law-of-the-case doctrine, once a court has ruled on an issue,

that decision generally should be adhered to in subsequent stages of the same action, unless

cogent or compelling reasons militate otherwise." (citations omitted)).

      Moreover, in urging this Court to grant leave to amend, Plaintiff relies on a

Second Circuit summary order. Summary orders have no precedential effect. See 2d Cir. Local

R. 32.1.1(a) ("Rulings by summary order do not have precedential effect."); Weiss v. Macy's

Retail Holdings Inc., 265 F. Supp. 3d 358, 365 (S.D.N.Y. 2017) (Because a summary order "has

no precedential effect," a "district court has no obligation to follow a summary order where the

reasoning was cursory or unsound."); Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv.

Bank, 924 F. Supp. 2d 528, 537 (S.D.N.Y. 2013) (rejecting argument that Section 10(b) claims were not time-barred where case cited by plaintiff was a "summary order" that "does not constitute binding precedent").

In any event, as explained below, even if (1) this Court exercised its discretion to reconsider its prior ruling, and (2) BPP Illinois had precedential effect, Plaintiff's motion for leave to amend its RICO claims would be properly denied. See DiLaura, 982 F.2d at 76 (The law of the case "'doctrine is admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.'" (citations omitted)).

## A.    The Second Circuit's Decision in *BPP Illinois*

In BPP Illinois, LLC v. Royal Bank of Scotland Grp., PLC, No. 13 Civ. 0638 (JMF), 2013 WL 6003701, at *4, 8 (S.D.N.Y. Nov. 13, 2013), aff'd in part, vacated in part, 603 F. App'x 57 (2d Cir. 2015), the district court dismissed plaintiffs' state law fraud claims as untimely on the ground that – under Pennsylvania law – plaintiffs were on inquiry notice of their potential claims by May 29, 2008, when several news articles were published stating that reported LIBOR rates were artificial. In so ruling, the district court rejected plaintiffs' contention that the inquiry notice issue had to be resolved by a jury. See id. at *6-7.

The Second Circuit "vacate[d] the district court's dismissal of the BPP Plaintiffs' claims as barred by Pennsylvania's two-year statute of limitations." BPP Illinois, 603 F. App'x at 58. The court reasoned that,

> "[p]ursuant to application of the [Pennsylvania] discovery rule, the point at which the complaining party should reasonably be aware that he has suffered an injury is a factual issue best determined by the collective judgment, wisdom, and experience of jurors." Crouse v. Cyclops Indus., 560 Pa. 394, 404, 745 A.2d 606 (2000). . . . "Only where the facts are so clear that reasonable minds could not differ may a court determine as a matter of law at the summary judgment stage, the point at which a party should have been reasonably aware of his or her injury and its cause and thereby fix the commencement date of the limitations period." Gleason v. Borough of Moosic, 609 Pa. 353, 363, 15

A.3d 479 (2011) (emphasis added).

BPP Illinois, 603 F. App'x at 58-59. The court further explained that under Pennsylvania law "the statute of limitations is an affirmative defense, and 'a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense.'" Id. at 59 (quoting Schmidt v. Skolas, 770 F.3d 241, 251 (3d Cir. 2014)). Accordingly, the BPP Illinois court found that "in concluding at the Rule 12(b)(6) stage that the BPP Plaintiffs failed to exhibit reasonable diligence in not discovering their injury by May 29, 2008, the district court acted too hastily." Id. Although "further proceedings might show that the BPP Plaintiffs' claims are . . . untimely under the [Pennsylvania] discovery rule, the present record is insufficient to decide this question as a matter of law." Id.

## B.     Whether Plaintiff's RICO Claim is Time-Barred

Plaintiff argues that BPP Illinois instructs that RICO claims cannot "be deemed time-barred at the pleading stage." (Pltf. Br. (Dkt. No. 174-1) at 10) BPP Illinois does not address the inquiry notice standard for federal claims such as RICO, however. Instead, BPP Illinois addresses whether and when – under Pennsylvania law – an issue of inquiry notice can be resolved on a motion to dismiss. See BPP Illinois, 603 F. App'x at 59. Accordingly, BPP Illinois does not undermine well-established Second Circuit law holding that statute of limitations questions concerning federal claims may properly be resolved on a motion to dismiss. See, e.g., Koch v. Christie's Int'l PLC, 699 F.3d 141, 153 (2d Cir. 2012) (affirming Rule 12(b)(6) dismissal of plaintiff's RICO claims on inquiry notice grounds); LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 157 (2d Cir. 2003) (affirming Rule 12(b)(6) dismissal of plaintiff's federal securities claim where it was clear from the "face of the complaint and related documents" that plaintiff was on inquiry notice).

In the alternative, Plaintiff argues that BPP Illinois establishes that the May 29,

2008 Wall Street Journal article – which this Court relied on in finding Plaintiff's RICO claims

time-barred – was insufficient to put Plaintiff on inquiry notice. (Pltf. Reply (Dkt. No. 184) at 6)

In responding, Defendants repeat that BPP Ilinois is inapposite because it involves the "dismissal

of state law claims as time-barred under the applicable Pennsylvania law." (Def. Br. (Dkt. No.

181) at 20)

The Second Circuit's decision last month in Charles Schwab Corp. v. Bank of

Am. Corp., 883 F.3d 68 (2d Cir. 2018) also addresses the significance of the May 29, 2008 Wall

Street Journal article, however. In that case, the Second Circuit – applying California law –

reversed a district court's determination that the plaintiff was on inquiry notice based on news

articles published by May 29, 2008. See Charles Schwab Corp., 883 F.3d at 96-97. The Second

Circuit's decision rested, in part, on California law, and under California law press reports are

not sufficient to put a plaintiff on inquiry notice unless there is "evidence that the plaintiff was

actually aware of the reporting in question." Id. at 97.

The Second Circuit went on to state that

> even if Schwab were aware of news articles that raised the possibility that "LIBOR had
> been at artificial levels since August 2007," . . . it is not certain that any of Schwab's
> claims would be time-barred. The BBA responded to the negative press reporting by
> assuring investors and journalists that its own investigation had confirmed the accuracy
> of LIBOR. It is plausible that Schwab reasonably relied on those assurances, thus
> delaying the start of the limitations period. See BPP Ill., LLC v. Royal Bank of Scot.
> Grp., PLC, 603 Fed. Appx. 57, 59 (2d Cir. 2015) (considering the same press reports at
> issue here, and reversing district court for "act[ing] too hastily" in dismissing LIBOR-
> manipulation claims as time-barred).

Id. at *19. The Second Circuit's analysis strongly suggests that, even if the news articles

published on or about May 29, 2008 are sufficient to place a plaintiff on inquiry notice, the

30

statute of limitations would be tolled under the doctrine of fraudulent concealment where a plaintiff plausibly alleges that it relied on the BBA's assurances that LIBOR was accurate.

Here, Plaintiff alleges that, "throughout 2008, the BBA engaged in affirmative acts that lulled any speculation that LIBOR had been or was being manipulated." (SAC (Dkt. No. 184-1) ¶ 188) Plaintiff further alleges that between April 2008 and May 29, 2008, the BBA and many of the Defendant banks made repeated public statements reassuring investors that "LIBOR had not been manipulated," and denying any wrongdoing. (See id. ¶¶ 189-194)

Given the Second Circuit's recent endorsement of the fraudulent concealment theory, this Court concludes that Plaintiff's RICO claims are not subject to dismissal as time-barred.

## C.   Whether Plaintiff's RICO Claims Are Barred by *Res Judicata*

Plaintiff contends that "the logic of the Second Circuit's holding" in BPP Illinois requires reconsideration of this Court's res judicata decision, "because, like the statute of limitations," res judicata "is an affirmative defense subject to a stringent standard of review unmet by Defendants and inappropriate in the absence of discovery." (Pltf. (Dkt. No. 174-1) at 11) This Court is not persuaded.

As discussed above, BPP Illinois addresses the proper application of a Pennsylvania statute of limitations under Pennsylvania law. BPP Illinois does not involve any application of res judicata, and nothing in that decision suggests that a court is precluded from evaluating res judicata arguments on a motion to dismiss. Indeed, controlling Second Circuit precedent establishes that "[a] court may consider a res judicata defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents

attached or incorporated therein, and materials appropriate for judicial notice." TechnoMarine
SA v. Giftports, Inc., 758 F.3d 493, 498 (2d Cir. 2014).

       Plaintiff also contends, however, that BPP Illinois requires reconsideration of this
Court's holding that Solow could have asserted his RICO claims in the prior state court action.
(See Pltf. Reply (Dkt. No. 184) at 9-10; Order (Dkt. No. 172) at 49-52) Plaintiff argues that BPP
Illinois establishes that the news articles published by May 29, 2008 were insufficient to place
Plaintiff on inquiry notice, and that therefore Plaintiff could not have brought his RICO claims in
the prior state action. (Pltf. Reply (Dkt. No. 184) at 9-10)

       Plaintiff's argument is unavailing, however, because this Court's determination
that Solow could have asserted his federal RICO claims in the prior state action did not depend
on whether the May 29, 2008 news reports put him on inquiry notice. While this Court
acknowledged the publication of multiple relevant news articles by May 29, 2008, this Court's
analysis turned on Plaintiff's concessions in the Amended Complaint that (1) a "'public
revelation regarding government investigations into possible LIBOR manipulation occurred on
March 15, 2011,'" disclosing that there were "'improper attempts by UBS, either acting on its
own or together with others, to manipulate LIBOR rates at certain times'"; and (2) numerous
news articles – published in March 2011 – reporting that U.S. authorities had subpoenaed many
of the Defendant banks, and initiated investigations into whether these banks had manipulated
LIBOR. (See Order (Dkt. No. 174) at 50-52 (quoting Am. Cmplt. (Dkt. No. 95-1) ¶¶ 81-84))
Given that all of these revelations occurred "prior to the state trial court's entry of judgment
against Solow" on March 24, 2011 (see Ruffino Decl., Ex. G (May 24, 2011 Judgment) (Dkt.
No. 118-4) at 11), this Court found that Solow was "on notice of the LIBOR-manipulation

scheme" and that he could have asserted his RICO claims in the state court action. (See Order (Dkt. No. 174) at 52)

In sum, BPP Illinois does not undermine this Court's prior determination that Plaintiff's RICO claims are barred by res judicata. Because Plaintiff's RICO claims are barred by res judicata, leave to amend these claims will be denied.[5]

## CONCLUSION

For the reasons stated above, Plaintiff's motion for leave to file a Second Amended Complaint is denied. The Clerk of the Court is directed to terminate the motion (Dkt. No. 174), and to close this case.

Dated: New York, New York
March 19, 2018

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[5] Having concluded that Plaintiff's proposed SAC does not remedy the defects in its federal claims, leave to amend is denied on that basis, and this Court does not reach Defendants' personal jurisdiction arguments.